**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

KELLY S.,

      **Plaintiff,**

v.                                 Civil Action 1:24–cv–577
                                     Judge Matthew W. McFarland
                                     Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Kelly S. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). It is **RECOMMENDED** that the Court **REVERSE** the Social Security Commissioner's nondisability finding and **REMAND** the case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff applied for DIB on March 16, 2020, alleging disability beginning on April 15, 2016, due to anxiety, depression, neck pain, and hand pain. (R. at 316–22, 337). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing by telephone on April 5, 2022. (R. at 100–26). The ALJ then issued a decision denying her benefits. (R. at 143–63).

But on January 20, 2023, the Appeals Council vacated the decision. (R. at 164–69). Consequently, another hearing was held on August 28, 2023. (R. at 80–99). The ALJ came to the same conclusion and again denied Plaintiff's benefit applications. (R. at 8–34). This time, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the

Commissioner's final decision. (R. at 1–7).

On October 14, 2024, Plaintiff filed the instant case seeking a review of the Commissioner's decision. (Doc. 1). As required, the Commissioner filed the administrative record. (Doc. 7). The matter has been fully briefed and is ready for the Court's review. (Docs. 12, 14).

### A. Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's April 5, 2022, hearing testimony as follows:

[Plaintiff] testified regarding her alleged impairments and limitations. [Plaintiff] testified she is unable to work due to anxiety. She further explained that she is afraid to drive herself, not having a family member nearby, and having panic attacks. She had symptoms while at work with ringing in her ears and heart pounding and feeling horrible. She went to the emergency room and was diagnosed with anxiety, but the symptoms never went away. She feels nervous all the time. Her symptoms are worse when she is not around her family. She has been receiving treatment at Southern Ohio Medical Center Psychiatric Associates for about the past four years, once a month, with a nurse practitioner in Dr. Duncan's office. [Plaintiff] testified she goes to sleep easily but wakes up during the night because of back and neck pain. She has medication for the pain but tries not to take them very often for fear of addiction.

[Plaintiff] also testified she has pain in her neck. The pain radiates into her right arm, thumb, and pointer finger. She also experiences tension headaches, but the cause is unknown. Stress brings on her headaches. Sometimes she will wake up during the night with a migraine. For pain relief, she takes Ibuprofen and Lortab, but not every day, about two to three times per week. During the days, she spends time with her mother and 4–year–old daughter. Her boyfriend's mother helps her with her daughter. She can use a microwave to prepare foods. She has many days that are bad, described as needing to stay away from noises in a quiet room, lying down, and doing breathing exercises. She usually takes Xanax and lies down. She showers about four days per week. Her mother–in–law cooks the bigger meals and the family goes there to eat. At home, she fixes simple meals, such as cereal and microwavable meals. Her mother–in–law, mother, or one of her sisters will take care of her shopping because if she has a big list, she will get panicky. For entertainment, she colors with her daughter. She helps her mother with her medications. She goes to the store, but if the line is long or there are many people there, she will have a panic attack and have to leave. She does not attend any social group meetings. She used to have friends but does not talk with them anymore. She does yoga, which helps with her coping but is not long lasting. She can do laundry and clean the house, but some days she does not do well.

2

(R. at 17–18).

The ALJ summarized Plaintiff's hearing testimony from the August 28, 2023, hearing as follows:

> *** [Plaintiff] discussed panic attacks and an inability to function. She said she was tired and felt hopeless. She could not be alone. She tried numerous medications, but it made it worse. She said Xanax helped but made her feel drowsy. She was very restless, and she could not sleep through the night. She would take naps during the day. She did not like to leave the house, and she would not shower consistently. She did not go places and socialized only with friends. She could do a little cleaning but relied on others for food preparation beyond simple meals, such as cereal. She also had some neck and back pain. She said she would get electric shocks down to her fingers if she moved too quickly. She said that her fingers would feel numb and tingly two to three days after quick movements. She experiences headaches and takes Lortab two to three times per week. She experiences a lot of tension headaches, and her doctor was not sure what causes them. If she moves quickly, it hurts her head. Stress also brings them on. She sometimes wakes up with severe migraine headaches. She indicated that shaking was a side effect from Lexapro. Xanax makes her drowsy and super tired. make drowsy. She takes hydroxyzine for anxiety, but she did not note any side effects. She also tried prayer and meditation to help with her mental health. She spends most of the day in bed on bad days, but she is able to go to the grocery store and clean on good days. She said she is unable to drive alone. She has difficulty going places without her family.

(R. at 18).

The ALJ also summarized Plaintiff's statements to the agency as follows:

> [Plaintiff] alleged limitations with lifting, squatting, bending, standing reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others (Exhibit 3E, p. 6). She could only pay attention for 5 to 10 minutes, did not finish what she started and was better with written than spoken instructions (Id.). She was good with authority figures, did not handle stress or changes in routine well and was terrified of being alone (Exhibit 3E, p. 7). Her medication made her feel drowsy and forgetful (Exhibit 3E, p. 8). She was in constant pain (Exhibit 3E, p. 1). Her anxiety prevented her from focusing. She had panic attacks (Id.). She was able to take care of her daughter, but she had difficulty sleeping and sometimes had issues with personal care (Exhibit 3E, p. 2). She could prepare simple meals and do some household chores (Exhibit 3E, p. 3). She did not go outside often, but she could drive a car (Exhibit 3E, p. 4). She could not go out alone, but she could shop in stores and handle money (other than a checkbook) (Id.). Her hobbies and interests included watching her nieces and nephews, playing sports, watching races and

> hanging out with friends—though she no longer did these things often (Exhibit 3E, p. 5).

(R. at 19).

### B. Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records as to her physical impairments as follows:

> Treatment records showed [Plaintiff] with complaints of cracking, popping, numbness and tingling in her neck and arms to the right thumb and first finger with movement (Exhibits 3F/2; 7F/70; 9F/1). Examinations showed normal range of motion of the cervical spine, albeit with stiffness and numbness in the right radial joint (Exhibits 4F/3; 7F/11, 103). Sensation was intact and equal throughout (Exhibit 3F/3). MRI showed moderate stenosis at C4/5 and to a lesser extent at C5/6 and narrowing at the left anterior aspect of the cord, but no evidence of compression of a nerve root (Exhibits 3F/3; 5F/12; 7F/72; 13F/39). Gregory Balturshot, M.D., noted on examination that [Plaintiff] had intermittent sensory symptoms, but these seemed to be improving, and she had no evidence of radiculopathy, weakness, or reflex changes. At the time of this examination, Dr. Balturshot observed she basically had no symptoms. James H. Duncan, D.O., a treating physician, diagnosed cervical region radiculopathy (Exhibits 7F; 9F; 13F; 14F). Despite her complaints of radicular symptoms, there is no evidence of electromyography/nerve conduction studies, suggested or performed.

> [Plaintiff] received emergency room treatment in 2016 for complaints of shortness of breath (Exhibit 2F/94). Other records showed her denying any shortness of breath or syncopal episodes (Exhibits 4F/1; 7F/2). She has been diagnosed with chronic obstructive pulmonary disease at least since July 2020 (Exhibit 7F/64). Respiratory examinations are normal (Exhibits 7F/65; 9F/19). Polysomnography showed no significant sleep–related breathing disorder (Exhibits 7F/148; 8F/8). She has smoked cigarettes since age 17 with some attempts at quitting (Exhibits 1F/3; 6F/3; 14F/121). Pulmonary function studies were positive for mild obstruction (Exhibit 14F/152).

> [Plaintiff] has a diagnosis of tachycardia (Exhibit 1F/2). She has had periods of sinus tachycardia and occasional premature atrial contractions (Exhibits 4F/5, 39; 7F/104). Palpitations were well controlled in 2017 and she had only occasional palpitations in 2018, which increased in 2019 with dyspnea on exertion (Exhibit 4F/5, 15). It was also noted she was still smoking about one pack of cigarettes per day against medical advice. By May 2019, tachycardic episodes were occurring 51 percent of the time on monitoring with normal limitations 48 percent of the time (Exhibits 5F/23; 7F/126; 13F/27; 14F/129). Cardiovascular examinations showed normal rate and rhythm, without chest pain or edema (Exhibits 7F/11; 9F/24).

4

> Treatment records showed [Plaintiff] with pain of the left hip joint and sacroiliac joint dysfunction on the left side (Exhibit 2F/7). Even so, she had normal range of motion and strength, and no bony tenderness in the left hip and lumbar back. She has been diagnosed with degenerative disc disease of the cervical spine (Exhibit 3F). She had a normal and steady gait (Exhibits 4F; 5F/8; 7F/2; 8F; 14F/3; 15F; 17F).

(R. at 19–20).

The ALJ summarized Plaintiff's medical records as to her mental health impairments as follows:

> [Plaintiff] has a history of anxiety with panic attacks (Exhibits 1F/2; 7F; 8F; 9F; 11F/4; 12F; 13F; 14F; 15F; 17F). A treating source noted [Plaintiff]'s history and physical examinations were consistent with generalized anxiety disorder (Exhibit 2F/88). She has received treatment with medications with improvement in symptoms, which were considered stable and controlled (Exhibit 4F/4). Because of symptoms, she reported to the psychological consultative examiner that she had sought emergency department treatment a number of times for anxiety symptoms, but treatment records only showed two or three visits (Exhibits 6F/2; 13F/9). Her primary care physician prescribes her medications (Exhibit 14F/47). In June 2020, she reported anxiety symptoms not as intense when taking Ativan (Exhibit 14F/58). She has never received inpatient psychiatric treatment (Exhibit 15F/5).
>
> Treatment records showed no complaints of depression (Exhibits 4F/3; 5F/8; 11F/4). The psychological consultative examiner diagnosed her with an adjustment disorder with mixed anxiety and depressed mood (Exhibit 6F/5). Symptoms included sadness; variable sleep and appetite; low motivation/energy, poor concentration/memory; loss of enjoyment; excessive guilt; tearfulness; social isolation; racing thoughts; anxiety; worry; catastrophic thinking; and panic attacks (Exhibit 15F/26). Psychological examination showed [Plaintiff] as cooperative, good personal hygiene, fully oriented; intact memory; some difficulty with concentration and abstract thinking; and fair insight and judgment (Exhibit 6F/4). Depression screenings showed at least mild depression (Exhibits 7F; 14F/43, 46). [Plaintiff] had intact judgment and insight, normal mood, and appropriate affect (Exhibits 7F/134; 8F/5). Records from Southern Ohio Medical Center showed a diagnosis of major depressive disorder, single episode, unspecified (Exhibits 15F; 16F; 19F).

(R. at 20).

The ALJ also summarized Plaintiff's medical records received after the prior unfavorable decision as follows:

5

>  \*\*\* Exhibit 21F contains records from James H. Duncan, D.O.; however, they mostly pertain to the period after the date last insured. [Plaintiff] did have a preventative health maintenance appointment on September 9, 2021, and the records reflect that she was experiencing multiple issues such as lower back pain and thoracic spinal pain, radiculopathy, meralgia paresthetica of the bilateral lower limbs, tachycardia, insomnia, COPD, and anxiety disorder (Exhibit 21F/2). Medication included ibuprofen, Lexapro, propranolol, hydroxyzine, hydrocodone, albuterol, pantoprazole and alprazolam (Exhibit 21F/2–3). The physical examination was unremarkable other than pain and stiffness in the cervical spine and pins and needles in the right arm (Exhibit 21F/3). Her medication was refilled (Exhibit 21F/4). When she returned a month later, the only issues noted during the physical examination were pain and stiffness in the cervical spine (Exhibit 21F/8). Her medication was refilled (Exhibit 21F/9). During the December 29, 2021 encounter—just before the date last insured—she was noted to have had no new medication, testing, surgery, or diagnoses (Exhibit 21F, p. 20). She did complain of dizziness, palpitations, back pain and left hip pain, headaches, paresthesia, and anxiety (Id.). The physical examination was unremarkable other than a BMI score of 31 and pain and stiffness in her cervical spine (Exhibit 21F, p. 22). [Plaintiff] continued to smoke cigarettes (Exhibit 21F/24). \*\*\*

(R. at 20–21).

C.     The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of April 15, 2016, through her date last insured of December 31, 2021. (R. at 14). The ALJ determined that, through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease; chronic obstructive pulmonary disease; tachycardia; arthritis; anxiety disorder; depressive disorder; and panic disorder. (*Id.*). Still, the ALJ found that through the date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> Through the date last insured, [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations. She can frequently climb ramps and stairs, and she can never climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, and crouch, and she can occasionally crawl. She is limited to occasional overhead reaching with the bilateral arms. She can frequently handle and finger with the right upper extremity.

6

> She should avoid concentrated exposure to humidity and atmospheric conditions, as defined by the SCO and the DOT. She can have occasional interaction with coworkers, supervisors, and the public. She can understand, remember, and carry out detailed, but not complex, instructions and tasks, meaning three to four steps. She can have no hourly quota work and only occasional changes in the work setting, with only occasional decision–making required.

(R. at 17).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 19).

Relying on the vocational expert's testimony, the ALJ found that through her date last insured, Plaintiff was unable to perform her past relevant work as a kitchen manager. (R. at 26). Further relying on the vocational expert's testimony, the ALJ concluded that Plaintiff would have been able to perform light exertional, unskilled jobs that existed in significant numbers in the national economy, such as a router; inspector; or mail clerk, non-postal. (R. at 26–27). She therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from April 15, 2016, the alleged onset date, through December 31, 2021, the date last insured (20 CFR 404.1520(g))." (R. at 27).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by

substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff argues that the ALJ erred in her analysis of the medical source opinions of Angela Occidental, CNP, and Brendan Giles, CNP. (Doc. 12 at 10–18). In response, the Commissioner counters that the ALJ considered the entire record to craft the RFC and gave proper reasons for her evaluation of the medical opinion evidence. (Doc. 14 at 4–10). Upon review, the Undersigned concludes that the ALJ's flawed evaluation of Nurse Giles's opinion warrants remand.

A plaintiff's RFC "is defined as the most [she] can still do despite the physical and mental limitations resulting from [her] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1545(a)(1). The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)–(5). For medical opinions, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must weigh the opinion with various factors in mind. *See* 20 C.F.R. § 404.1520c(c)(1)–(5). Among them, supportability and consistency are the most important, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2).

When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the

8

more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and non-medical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). And, although an ALJ may discuss how she evaluated the other factors, generally she is not required to do so. *See* 20 C.F.R. § 404.1520c(b)(2).

The ALJ's role is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20–CV–1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The Court's role is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supporting the conclusion with substantial evidence. *Id.* at *14.

In July 2023, Certified Nurse Practitioner Brennon Giles completed a medical opinion on Plaintiff's ability to complete different work-related activities on a day-to-day basis in a regular work setting. (R. at 1484). The form provided the following rating definitions: "limited but satisfactory means your patient has noticeable difficulty [engaging in the work-related activity] no more than 10 percent of the workday or work week." (*Id.*). "Seriously limited means your patient has noticeable difficulty [engaging in the work-related activity] from 11 to 20 percent of the workday or work week." (*Id.*).

Nurse Giles rated Plaintiff as "limited but satisfactory" in her ability to understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public;

9

and maintain socially appropriate behavior. (R. at 1484–85). He rated Plaintiff as "seriously limited" in her ability to remember work-like procedures; maintain attention for two-hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; deal with normal work stress; understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; travel in an unfamiliar place; and use public transportation. (*Id.*).

Nurse Giles also provided narrative explanations for his ratings. He said that Plaintiff "has not responded appropriately to stress over time," and has a "history of leaving jobs due to panic/anxiety." (R. at 1484). He noted that Plaintiff's anxiety and panic would impair her ability to sustain focus and remember detailed work and that she does not respond appropriately to change. (R. at 1484–85). He also cited his "office notes" as further support that Plaintiff would have difficulty working at a regular job on a sustained basis. (R. at 1485). He opined that Plaintiff would miss an average of four or more days of work per month due to her impairments or treatments. (*Id.*). Finally, he noted that Plaintiff's first visit to his office was in October 2020, but she reported her impairments began in approximately 2015. (*Id.*).

The ALJ found Nurse Giles's opinion "not persuasive":

[Plaintiff] also submitted a medical opinion regarding the ability to do work–related activities (mental), which was completed by her treating provider, Brennon Giles, APRN, in July 2023 (Exhibit 24F). This provider noted [Plaintiff] had been visiting the office since October 2020. He indicated [Plaintiff] would be seriously limited in a number of ways such as remembering work–like procedures, maintaining attention for two hours, maintaining regular attendance, sustaining an ordinary

10

>routine without special supervision, completing a normal workday and workweek, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to supervisors, responding appropriately to changes and dealing with normal work stress. He noted [Plaintiff] had not responded appropriately to stress over time, and she had a history of leaving jobs due to panic and anxiety. She also would be seriously limited regarding semi–skilled and skilled work and would have serious limitations regarding traveling to unfamiliar places and using public transportation. [Plaintiff] would miss more than four days of work per month. The undersigned finds this assessment is not persuasive. This assessment is not consistent with treatment records showing generally normal psychiatric examinations with only a few exceptions (Exhibits 6F; 7F/39, 48, 56; 14F; 15F). This assessment is also not supported by Ms. Occidenta[l]'s assessment because her treatment has primarily consisted of [Plaintiff]'s physical problems, not mental (Exhibit 7F). The records do not support the need to miss four days a month either. There is no real explanation for this limitation in the records. The [ALJ] also notes that while Mr. Giles noted that [Plaintiff] had been visiting the office since October 2020, it is unclear how long he had been treating [Plaintiff], which is relevant since this form was completed over 2 ½ years after the date last insured.

(R. at 24–25).

Plaintiff submits that the ALJ erred in her analysis of the supportability of Nurse Giles's opinion. The Undersigned agrees. To begin, the ALJ seems to have copied the supportability analysis for a different provider instead of engaging in a true supportability analysis for Nurse Giles's opinion. (*Compare* R. at 22 (considering Nurse Occidental's March 2020 opinion and stating, "[t]his assessment is also not supported by Ms. Occidenta[l]'s own assessment because her treatment has primarily consisted of [Plaintiff's] physical problems, not mental (Exhibit 7F)") *with* R. at 24 (stating the same of Nurse Giles's opinion)). This mistake may not translate into a reversible articulation error if the ALJ's statement about Nurse Occidental treating Plaintiff's physical problems was also accurate for Nurse Giles. But that is not the situation here.

Nurse Giles, who is a psychiatric nurse practitioner, first met with Plaintiff in October 2020 and conducted an initial evaluation. (R. at 856; *see also* R. at 877 (stating Nurse Giles is a psychiatric nurse practitioner)). He assessed her as having generalized anxiety disorder and

11

prescribed medication. (R. at 859–60). Over the next 13 months, he saw her seven more times, in November 2020, January 2021, February 2021, March 2021, July 2021, August 2021, September 2021, and December 2021. (R. at 862, 886 (also assessing Plaintiff as having depression), 897 (also assessing Plaintiff as having a panic disorder), 913, 1155, 1229, 1240). Plaintiff further attended appointments with Nurse Giles several times in 2022 and 2023. (R. at 1427, 1432, 1438, 1443, 1448, 1453). The clinical notes from each visit show that Nurse Giles treated Plaintiff for mental and emotional health-related issues—not for "physical problems" as the ALJ claimed. (R. at 24; *cf.* R. at 862, 886, 897, 913, 1155, 1229, 1240).

Equally concerning, the ALJ cited one exhibit, Exhibit 7F, while evaluating Nurse Giles's opinion. None of the records discussed above appear in that exhibit. (*See* R. at 862, 886, 897, 913, 1155, 1229, 1240). The oversight also renders other parts of the ALJ's analysis suspect. Particularly, the ALJ stated that "[t]he records do not support the need to miss four days a month either." (R. at 24–25). But "the records" cited are not Nurse Giles's records. In the end, the Undersigned is left wondering which of Nurse Giles's treatment records, if any, the ALJ reviewed.

The Commissioner attempts to save the ALJ's analysis by citing to the ALJ's comment that "while Mr. Giles noted that [Plaintiff] had been visiting the office since October 2020, it is unclear how long he had been treating [Plaintiff], which is relevant since this form was completed over 2 ½ years after the date last insured." (Doc. 14 at 9 (citing R. at 25)). The Commissioner submits that this comment contained a "scrivener's error," and the ALJ meant to say that it was unclear whether the 2023 opinion covered Plaintiff's condition during the relevant period. (*Id.*). But that is not what the ALJ said. The ALJ said it was unclear "how long [Nurse Giles] had been treating [Plaintiff]," while the dated records show when he began treating her and how often he saw her for mental health treatment during the relevant period. (R. at 25; *see* R. at 862, 886, 897,

12

913, 1155, 1229, 1240). Ultimately, the Undersigned is unable to accept the Commissioner's post hoc rationalization to the contrary. *See, e.g.*, *Williams v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-00235, 2021 WL 2456821, at *5 (S.D. Ohio June 16, 2021) (citing *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014), *report and recommendation adopted*, No. 3:20-CV-235, 2021 WL 3035959 (S.D. Ohio July 19, 2021)); *Salisbury v. Comm'r of Soc. Sec.*, No. 2:19-CV-5277, 2020 WL 5290536, at *7 (S.D. Ohio Sept. 4, 2020) (collecting cases), *report and recommendation adopted*, No. 2:19-CV-5277, 2021 WL 164256 (S.D. Ohio Jan. 19, 2021).

The error is not harmless. Had the ALJ properly analyzed the supportability of Nurse Giles's opinion, she may have determined that the opinion deserved more weight and that Plaintiff's RFC required additional limitations. *See Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) ("Even if supported by substantial evidence . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). Plus, the ALJ's citation to another provider's treatment notes does not provide any further insight on her supportability analysis for Nurse Giles's opinion. (R. at 24–25). Given these issues, the Undersigned cannot conduct the meaningful review required to determine if substantial evidence supports the ALJ's decision. *See Kimberly S. v. Comm'r of Soc. Sec.*, No. 3:21-cv-310, 2022 WL 17820565, at *4 (S.D. Ohio Dec. 20, 2022) (finding reversible error where the ALJ failed to discuss the supportability factor and did not provide proper explanations for disregarding certain limitations); *Wilson C. v. Comm'r of Soc. Sec.*, No. 3:20-cv-457, 2022 WL 4244215, at *8 (S.D. Ohio Sept. 15, 2022) (finding an ALJ's failure to discuss supportability was not harmless error where it prevented the court from conducting a meaningful review); *Crystal E. J. v. Comm'r of Soc. Sec.*, No. 2:21-cv-4861, 2022 WL 2680069, at *7–8 (S.D. Ohio July 12, 2022) (same). In other words, the ALJ

has not built "an accurate and logical bridge between the evidence and [her] conclusion." *Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020).

On remand, the ALJ ultimately may reach the same conclusion on Nurse Giles's opinion and Plaintiff's overall RFC. But the ALJ must "show . . . her work" and explain with sufficient detail how she evaluated supportability for each medical opinion. *Shanan v. Comm'r of Soc. Sec.*, No. 2:23-cv-1678, 2024 WL 3740443, at *7 (S.D. Ohio Aug. 9, 2024) (citing *Hardy v. Comm'r of Soc. Sec.*, 554 F.Supp.3d 900, 909 (E.D. Mich. Aug. 13, 2021)). As the ALJ's opinion stands, the Undersigned cannot tell if or how she considered Nurse Giles's opinion.

As a final note, because the Undersigned is recommending remanding this case, it is unnecessary to address Plaintiff's other assignments of error in detail. On remand, the ALJ may consider the issues if appropriate.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

Date: April 22, 2025 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE

14

**PROCEDURE ON OBJECTIONS**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).